1  Michael D. Braun (SBN 167416)
   service@braunlawgroup.com
2  **BRAUN LAW GROUP, P.C.**
   10680 W. Pico Blvd., Suite 280
3  Los Angeles, CA 90064
   Phone: (310) 836-6000
4  Fax:    (310) 836-60106

5  Janet Lindner Spielberg (SBN 221926)
   jlspielberg@jlslp.com
6  **LAW OFFICE OF JANET LINDNER SPIELBERG**
7  12400 Wilshire Blvd., Suite 400
   Los Angeles, CA 90025
8  Phone: (310) 392-8801
   Fax:    (310) 278-5938

9  Richard A. Adams *(Admitted Pro Hac Vice)*
10 radams@pattonroberts.com
   **PATTON ROBERTS PLLC**
11 2900 St. Michael Drive, Suite 400
   Texarkana, Texas 75505-6128
12 Phone: (903) 334-7000
   Fax:    (903) 334-7007
13
   *Counsel for Plaintiffs*
14

15            **UNITED STATES DISTRICT COURT**

16           **CENTRAL DISTRICT OF CALIFORNIA**

17               **WESTERN DIVISION**

18 ANGELA RUSS; SHAWN MARTIN;      CASE NO. CV 09-0904 VBF (FMOx)
   and NITISHA INGRAM, individually
19 and on behalf of all others similarly   HON. VALERIE BAKER FAIRBANK
   situated,
20                                 <u>CLASS ACTION</u>
            Plaintiffs,
21                                 **FIRST AMENDED COMPLAINT FOR**
      vs.                          **INJUNCTIVE, EQUITABLE, AND**
22                                 **DECLARATORY RELIEF**
   APOLLO GROUP, INC.; and THE
23 UNIVERSITY OF PHOENIX, INC.     **JURY TRIAL DEMANDED**

24        Defendants.

25

26

27

28
   _____

FILED
2009 AUG 11 PM 2: 53
CLERK, U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY _____

**INTRODUCTION**

Plaintiffs, by and through their undersigned attorneys, hereby complain against Apollo Group, Inc. ("Apollo") and The University of Phoenix, Inc. ("UOP") (collectively referred to as "Defendants") on behalf of themselves and the proposed class of similarly-situated students, upon information and belief, except as to their own actions, the investigation of their counsel, and the facts that are a matter of public record, as follows:

1.    Plaintiffs and Class members (as defined below) were former UOP students who applied for Federal student loans to pay for their UOP education.[1] Although each student withdrew from UOP within weeks of enrolling, they attended long enough to incur some amount of tuition-related debt that UOP was entitled to debit from the students' Federal loans. Although UOP was in possession of each student's Federal loan money, rather than debiting the amount owed for tuition, UOP, without the knowledge or consent of the students, cancelled the Federal loans, returned the loan monies to the lenders and thereafter sought to immediately collect the entire amount outstanding directly from the students.

2.    UOP's financial aid disclosure documents – given to all prospective students throughout the class period – provided Title IV loans as an option by which to pay their tuition. UOP knew that the vast majority of prospective students would require financial aid funds to pay tuition. UOP also knew that the vast majority of students ultimately withdraw from UOP before completing their educational program. Yet, UOP failed to provide meaningful notice to prospective students of its routine practice not to utilize Federal loan monies toward the payment of tuition for students who withdrew from UOP early in their educational program. Nor did UOP provide meaningful notice that the terms for repayment of any resulting debt, allegedly incurred by the students to

---

[1] Federal student loans refer to the family of student loans guaranteed by the United States and authorized under Title IV of the Higher Education Act. They will be

1  UOP, would be on terms substantially more onerous than the terms associated with the

2  re-payment of Title IV loans.

3      3.      UOP's motivation behind this seemingly illogical and counterintuitive

4  conduct, however, is clear.  Title IV loans have become the financial backbone of the

5  private-for-profit education industry in which Defendants have a significant presence.

6  Participation in the Federal loan program is highly coveted and, for most schools,

7  essential for their financial viability.  Indeed, according to Apollo's 2007 Annual Report

8  issued on Form 10-K, nearly 70% of their annual revenues are derived from Federal

9  loans.  But for the existence of Title IV loans, the majority of UOP students could not

10  afford to attend.

11      4.      Recognizing that students and schools have become heavily dependent on

12  the Federal loan program, the government has set forth a number of requirements for

13  schools to meet in order to remain eligible to participate in Title IV programs – the most

14  significant of which are threshold cohort default rates.  In sum, cohort default rates

15  represent the percentage of a school's borrowers who enter repayment on Federal loans

16  during a given fiscal year and default.  To remain eligible to participate in Title IV

17  programs, educational institutions must maintain a student loan cohort default rate that

18  does not exceed 25% for three consecutive years, or exceed 40% for any given year.

19  Moreover, if a school's student loan default rate equals or exceeds 10%, the school must

20  delay for 30 days the release of federal student loan proceeds for first time borrowers and

21  permanently loses the ability to participate in the "school-as-lender" program, among

22  other penalties.

23      5.      Statistics and logic suggest that borrowers who do not complete their

24  program of study are significantly more likely to default than those who complete their

25

26

27  _____

referred to throughout the Complaint as "Federal" or "Title IV" loans or "Federal

28  financial aid funds."

course of study.[2] UOP's completion rate for undergraduate students working toward an associate or baccalaureate degree, who started between September 1, 2001 and August 31, 2002, was only 9.77%.[3]

6.    Not surprisingly, schools have employed a number of measures to minimize their cohort default rates.  While legitimate measures such as those designed to counsel and educate borrowers, are highly encouraged by the government, any attempt to artificially deflate cohort default rates to maintain eligibility in the program are strictly prohibited.

7.    UOP reported cohort defaults rates of 7.2%, 7.3% and 7.5% for fiscal years 2004, 2005 and 2006, respectively.  Not only do UOP's default rates closely border the 10% threshold, the vast majority of their students, having never completed their course of study, run a significant statistical risk of defaulting.

8.    By returning a students' Federal loan money, even after the student incurred a tuition related charge, UOP takes away all the repayment benefits students enjoy from borrowing through the Title IV loan programs.  UOP also effectively prevents such a student from ever being considered part of the cohort default analysis.

9.    By returning a student's Federal loan money to the lender, UOP effectively pays off that student's loan, eliminating the student's contractual obligation with their lender.  Rather than eradicating the debt on their books, however, UOP then seeks to collect the debt directly from the student.

10.    In addition to the fact that UOP had no right to interfere with a contract between a student and a third party lender, UOP also did not have the right to seek a payment directly from a student who has chosen, with UOP's assistance, to pay for

---

[2] *Student Loan Default Literature Review*, December 22, 2004, Robin McMillion. TG Research and Analytic Services.

[3] These statistics are mandated by the HEA and are UOP's most recent statistics as presented at
http://www.phoenix.edu/about_us/consumer_information.aspx#student_completion_rate.

his/her education by using Federal loans. Doing so deprives students of the benefits of the terms on which they borrowed money (*i.e.*, low interest and a six-month grace period in which to start paying) and saddles them with an immediate debt and payment terms which were never acceded to by the student by contract or otherwise. Unsuspecting students are routinely bombarded with calls, letters and e-mails from UOP to collect this debt along with threats that failure to pay will result in referral to collection agencies and negatively impact their credit.

11.    UOP's actions have yielded millions of dollars in ill-gotten gains.

12.    Plaintiffs bring this class action on behalf of themselves and all UOP students who: in the last four years opted to pay for tuition by means of Federal financial aid; applied and were certified to receive Federal financial aid; who accrued tuition-related debt; whose Federal financial aid was not used to pay for tuition-related debt and was instead returned to the lender by UOP; and from whom UOP then sought direct payment of such debt.

## PARTIES

13.    Plaintiff Angela Russ:

a.    Ms. Russ is a resident of Los Angeles County, California and attended UOP's Gardena campus. Ms. Russ enrolled in a Bachelor of Science in Business Management class on August 16, 2006 and began classes on or about August 31, 2006. Ms. Russ sought to terminate her enrollment on October 13, 2006 and was officially withdrawn on November 16, 2006.

b.    Ms. Russ applied for and was notified that she was eligible for a Federal loan by which to pay for her UOP education. On or about August 23, 2006, Ms. Russ contracted with Wells Fargo for Title IV loans. Ms. Russ' Student Financial Agreement designated the Financial Aid Plan as the primary finance option. Ms. Russ did not personally have funds to pay for tuition, nor would she have attended UOP if she had to pay for it on a cash basis. On November 16, 2006, Ms. Russ withdrew from UOP. Between the date of enrollment and the date of withdrawal, Ms. Russ incurred

4

1  tuition-related debt which should have been paid to UOP from Ms. Russ' Title IV loan.
2  Rather than debiting the money from Ms. Russ' Title IV loan, UOP, without Ms. Russ'
3  knowledge or consent cancelled her Title IV loan, paid it off in its entirety and then
4  sought to collect the tuition directly from her.

5         c.    Consistent with Ms. Russ' enrollment documents, she provided UOP
6  Title IV funds to pay for tuition. By cancelling, returning, and/or not providing her with
7  the option of using her loan funds to pay off her tuition debt, UOP extinguished her debt
8  for its own purposes. UOP's subsequent effort to collect on the amount which they
9  chose to pay off was not based on any contractual right, nor did it reflect any obligation
10 that Ms. Russ had undertaken vis-à-vis UOP.

11        d.    UOP had no right to interfere with the contract between Ms. Russ and
12 her lender. Nor did UOP have any right to cancel the loan with Ms. Russ' lender,
13 assume the debt and seek to collect monies directly from Ms. Russ. This action not only
14 imposes a requirement where none had been contracted, it was an illegal attempt to
15 convert a Title IV loan owed to a third party lender, with certain rights, privileges and
16 obligations, into a new and different debt owed directly to the school.

17        e.    Prior to enrollment, UOP provided Ms. Russ with a Student Financial
18 Agreement and a Financial Aid Entrance Interview form. The Student Financial
19 Agreement presented Ms. Russ with six options for how she intended to finance her
20 UOP education and required Ms. Russ to select one option as her primary choice.
21 Ms. Russ selected the option designated "Financial Aid Plan." The Student Financial
22 Agreement did not provide Ms. Russ with notice that if she were to withdraw from UOP,
23 UOP would not apply Title IV financial aid funds to cover her tuition costs. The
24 document entitled "Financial Aid Entrance Interview" listed 21 topics related to financial
25 aid. The Financial Aid Entrance Interview did not provide Ms. Russ with notice that if
26 she were to withdraw from UOP, UOP would not utilize Title IV financial aid funds to
27 cover her tuition costs. To the contrary, the language contained on the Financial Aid
28 Entrance Interview form suggested the opposite (*see* #17 "**I must repay my entire loan**

5

FIRST AMENDED COMPLAINT FOR
INJUNCTIVE, EQUITABLE, AND DECLARATORY RELIEF

**even if I do not complete my education....**").    The ability to use Title IV financial aid funds to cover the cost of tuition was material for Ms. Russ in electing to attend UOP. UOP intended that Ms. Russ rely on these financial aid documents – requiring her to sign and date each document. Ms. Russ justifiably relied on these documents.  UOP knew, or should have known, that these documents omitted material information and contained misleading representations.  But for the availability of Title IV funds, Ms. Russ would not have attended the school.  Ms. Russ' injuries – including money paid to UOP on her behalf and any debt incurred to UOP – were directly and proximately caused by UOP's misrepresentations.

14.    Plaintiff Nitisha Ingram:

a.    Ms. Ingram is a resident of Pulaski County, Arkansas and attended the Little Rock campus of UOP.  Ms. Ingram enrolled and began classes for a Masters of Business Administration in or around February, 2007.

b.    Ms. Ingram applied for, qualified and received Federal loan monies to pay for her UOP education.  Ms. Ingram contracted with a bank for Title IV loans. Ms. Ingram's Student Financial Agreement designated Financial Aid Plan as the primary finance option.  Ms. Ingram did not personally have the funds on hand to pay for her education, nor would she have attended UOP if she had to pay for it on a cash basis. Ms. Ingram, after attending classes for approximately four weeks, decided to withdraw from UOP.  Between the date of enrollment and the date of withdrawal, Ms. Ingram incurred tuition-related debt which should have been paid to UOP from Ms. Ingram's Title IV loan. Rather than debiting the money from Ms. Ingram's Title IV loan, UOP, without Ms. Ingram's knowledge or consent, cancelled and/or paid off the loan in its entirety and then sought to collect the tuition directly from her.

c.    Consistent with Ms. Ingram's enrollment documents, she provided UOP with Title IV funds to pay for tuition.  By cancelling, returning and/or not providing her with the option of using her loan funds to pay off her tuition debt, UOP extinguished the debt for its own purposes.  UOP's subsequent effort to collect on the

6

1  amount which UOP chose to pay off is not based on any contractual right, nor does it
2  reflect any obligation that Ms. Ingram has undertaken vis-à-vis UOP.

3        d.     UOP had no right to interfere with the contract between Ms. Ingram
4  and her lender.  Nor UOP have any right to cancel the loan with Ms. Ingram's lender,
5  assume the debt and seek to collect directly from Ms. Ingram.  This action not only
6  imposes a requirement where none has been contracted, it is an illegal attempt to convert
7  a Title IV loan owed to a third party lender, with certain rights, privileges and
8  obligations, into a new and different debt owed directly to the school.

9        e.     UOP unilaterally paid off her Title IV loan – deliberately giving back
10 to the lender the portion UOP was entitled to keep.  UOP now seeks the amount it
11 returned – $5,354.00 – directly from Ms. Ingram.  UOP provided Ms. Ingram the
12 following alternatives: (a) to re-enroll in classes in order to recover her financial aid;
13 (b) to apply for private, high-interest loans to replace her low-interest Title IV loan that
14 she previously acquired and which UOP paid off; or (c) set up a payment plan with UOP
15 that requires full debt repayment within six months.  UOP further represented that if Ms.
16 Ingram failed to select one of these options, or otherwise immediately pay off the debt in
17 full, her account would be turned over to collections, which would adversely affect her
18 credit.  Subsequently, UOP did turn over her account to a debt collector.

19       f.     Prior to enrollment, UOP provided Ms. Ingram with a Student
20 Financial Agreement and a Financial Aid Entrance Interview form.  The Student
21 Financial Agreement presented Ms. Ingram with six options for how she intended to
22 finance her UOP education and required Ms. Ingram to select one option as her primary
23 choice.  Ms. Ingram selected the option designated "Financial Aid Plan."  The Student
24 Financial Agreement did not provide Ms. Ingram with notice that if she were to
25 withdraw from UOP, UOP would not apply Title IV financial aid funds to cover her
26 tuition costs.  The document entitled "Financial Aid Entrance Interview" listed 21 topics
27 related to financial aid.   The Financial Aid Entrance Interview did not provide
28 Ms. Ingram with notice that if she were to withdraw from UOP, UOP would not utilize

7

Title IV financial aid funds to cover her tuition costs. To the contrary, the language contained on the Financial Aid Entrance Interview form suggested the opposite (*see* #17 **"I must repay my entire loan even if I do not complete my education...."**). The ability to use Title IV financial aid funds to cover the cost of tuition was material for Ms. Ingram in electing to attend UOP. UOP intended that Ms. Ingram rely on these financial aid documents – requiring her to sign and date each document. Ms. Ingram justifiably relied on these documents. UOP knew, or should have known, that these documents omitted material information and contained misleading representations. But for the availability of Title IV funds, Ms. Ingram would not have attended the school. Ms. Ingram's injuries – including money paid to UOP on her behalf and any debt incurred to UOP – were directly proximately caused by UOP's misrepresentations.

15.    Plaintiff Shawn Martin:

a.    Mr. Martin is a resident of Pulaski County, Arkansas and attended the Little Rock campus of UOP. Mr. Martin enrolled in the Criminal Justice program on or about July 30, 2008. He attended orientation on August 21, 2008 and began classes on August 26, 2008.

b.    Mr. Martin applied for, qualified and received a Federal loan to pay for his UOP education. Concurrent with enrollment, Mr. Martin contracted with Citibank for Title IV loans. Mr. Martin's Student Financial Agreement designated the Financial Aid Plan as the primary finance option. Mr. Martin did not personally have funds to pay for tuition, nor would he have attended UOP if he had to pay for it on a cash basis. On October 15, 2008, Mr. Martin withdrew from UOP after attending UOP for approximately eight weeks. Between the date of enrollment and the date of withdrawal, Mr. Martin incurred tuition-related debt which should have been paid to UOP from Mr. Martin's Title IV loan. Rather than debiting the money from Mr. Martin's Title IV loan, UOP, without Mr. Martin's knowledge or consent, cancelled his Title IV student loan, paid it off in its entirety, and then sought to collect the tuition directly from him.

8

1        c.     Consistent with Mr. Martin's enrollment documents, he provided
2  UOP with Title IV funds to pay for tuition.  Upon information and belief, by cancelling,
3  returning and/or not providing him with the option of using his loan funds to pay his
4  tuition debt, UOP extinguished Mr. Martin's debt for its own purposes.  Any subsequent
5  effort by UOP to collect on the amount which they chose to pay off is not based on any
6  contractual right, nor does it reflect any obligation that Mr. Martin has undertaken vis-à-
7  vis UOP.

8        d.     UOP had no right to interfere with the contract between Mr. Martin
9  and his lender.  Nor did UOP have any right to cancel the loan with Mr. Martin's lender,
10  assume the debt and seek to collect it directly from Mr. Martin.  This not only imposes a
11  requirement where none has been contracted, it is an illegal attempt to convert a Title IV
12  loan owed to a third party lender, with certain rights, privileges and obligations, into a
13  new and different debt owed directly to the school.

14        e.     Prior to enrollment, UOP provided Mr. Martin with a Student
15  Financial Agreement and a Financial Aid Entrance Interview form.  The Student
16  Financial Agreement presented Mr. Martin with six options for how he intended to
17  finance his UOP education and required Mr. Martin to select one option as his primary
18  choice.  Mr. Martin selected the option designated "Financial Aid Plan."  The Student
19  Financial Agreement did not provide Mr. Martin with notice that if he were to withdraw
20  from UOP, UOP would not apply Title IV financial aid funds to cover his tuition costs.
21  The document entitled "Financial Aid Entrance Interview" listed 21 topics related to
22  financial aid.   The Financial Aid Entrance Interview did not provide Mr. Martin with
23  notice that if he were to withdraw from UOP, UOP would not utilize Title IV financial
24  aid funds to cover his tuition costs.  To the contrary,  the language contained on the
25  Financial Aid Entrance Interview form suggested the opposite (*see* #17 "**I must repay**
26  **my entire loan even if I do not complete my education....**").  The ability to use Title
27  IV financial aid funds to cover the cost of tuition was material for Mr. Martin in electing
28  to attend UOP.  UOP intended that Mr. Martin rely on these financial documents –

requiring him to sign and date each document. Mr. Martin justifiably relied on these documents. UOP knew, or should have known, that these documents omitted material information and contained misleading representations. But for the availability of Title IV funds, Mr. Martin would not have attended the school. Mr. Martin's injuries – including money paid to UOP on his behalf and any debt incurred to UOP – were directly and proximately caused by UOP's misrepresentations.

16.    Plaintiff Julia Moorehead:

a.    Ms. Moorehead is a resident of Pulaski County, Arkansas and, while living in Little Rock, Arkansas, enrolled in UOP. Ms. Moorehead enrolled in a Bachelor of Science in Information Technology degree program and began classes on or about July 25, 2007. Ms. Russ sought to terminate her enrollment on August 8, 2007.

b.    Ms. Moorehead applied for and was notified that she was eligible for a Federal loan to pay for her UOP education. Ms. Moorehead contracted with Citibank for Title IV loans. On or about August 2, 2007, Ms. Moorehead received a letter from Citibank indicating that her student loan application had been approved and that she could expect a disbursement of $2,000.00 on August 3, 2007. Ms. Moorehead's Student Financial Aid Agreement designated Federal financial aid as the primary finance option. Ms. Moorehead did not personally have funds to pay for tuition, nor would she have attended UOP if she had to pay for it on a cash basis. On August 8, 2007, Ms. Moorehead withdrew from UOP. Between the date of enrollment and the date of withdrawal, Ms. Moorehead incurred tuition-related debt which should have been paid to UOP from Ms. Moorehead's Title IV loan. Rather than debiting the money from Ms. Moorehead's loan, UOP, without Ms. Moorehead's knowledge or consent, cancelled her Title IV loan, paid it off in its entirety and then sought to collect the tuition directly from her.

c.    Consistent with Ms. Moorehead's enrollment documents, she provided UOP with Title IV funds to pay for tuition. By cancelling, returning and/or not offering her the option of using her loan funds to pay off her tuition, UOP extinguished

10

1    her debt for its own purposes.  UOP's subsequent effort to collect on the amount which it

2    chose to pay off was not based on any contractual right, nor did it reflect any obligation

3    that Ms. Moorehead had undertaken vis-à-vis UOP.

4             d.      UOP had no right to interfere with the contract between

5    Ms. Moorehead and her lender.  Nor did UOP have any right to cancel the loan with Ms.

6    Moorehead's lender, assume the debt and seek to collect monies directly from

7    Ms. Moorehead.  This not only imposes a requirement where none had been contracted,

8    it was an illegal attempt to convert a Title IV loan owed to a third party lender, with

9    certain rights, privileges and obligations, into a new and different debt owed directly to

10   the school.

11            e.      Prior to enrollment, UOP provided Ms. Moorehead with a Student

12   Financial Agreement and a Financial Aid Entrance Interview form.  The Student

13   Financial Agreement presented Ms. Moorehead with six options for how she intended to

14   finance her UOP education and required Ms. Moorehead to select one option as her

15   primary choice.  Ms. Moorehead selected the option designated "Financial Aid Plan."

16   The Student Financial Agreement did not provide Ms. Moorehead with notice that if she

17   were to withdraw from UOP, UOP would not apply Title IV financial aid funds to cover

18   her tuition costs.  The document entitled "Financial Aid Entrance Interview" listed

19   21topics related to financial aid.   The Financial Aid Entrance Interview did not provide

20   Ms. Moorehead with notice that if she were to withdraw from UOP, UOP would not

21   utilize Title IV financial aid funds to cover her tuition costs.  To the contrary, the

22   language contained on the Financial Aid Entrance Interview form suggested the opposite

23   (*see* #17 "**I must repay my entire loan even if I do not complete my education....**").

24   The ability to use Title IV financial aid funds to cover the cost of tuition was material for

25   Ms. Moorehead in electing to attend UOP.  UOP intended that Ms. Moorehead rely on

26   these financial documents – requiring her to sign and date each document.  Ms.

27   Moorehead justifiably relied on these documents.  UOP knew, or should have known,

28   that these documents omitted material information and contained misleading

representations. But for the availability of Title IV funds, Ms. Moorehead would not have attended the school. Ms. Moorehead's injuries – including money paid to UOP on her behalf and any debt incurred to UOP – were directly and proximately caused by UOP's misrepresentations.

17.    Defendant Apollo Group, Inc. ("Apollo") is an Arizona corporation with its principal place of business at 4615 East Elwood Street, Phoenix, Arizona 85040. Apollo, through its subsidiaries, provides various educational programs and services at high school, college, and graduate levels. The University of Phoenix is its largest and most profitable subsidiary. In 2007, Apollo's consolidated revenues were $2.7 billion, approximately 93% of which was attributable to UOP.

18.    The University of Phoenix, Inc. ("UOP") offers Associate's, Bachelor's, Master's, and Doctoral degree programs in business, criminal justice, general studies, health administration and information technology at 79 local campuses and 117 learning centers in 38 states and in the District of Columbia, Puerto Rico, Canada, Mexico and the Netherlands. It has 41 campuses in California, a number of which are in this District.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which the Plaintiffs are citizens of California and Arkansas, and Defendants are citizens of Arizona.

20.    This Court has personal jurisdiction over Defendants because they have purposefully availed themselves of the privilege of conducting business activities within the State of California by opening campuses, enrolling students, and facilitating the financial aid process among other systematic and continuous business contacts with the State.

21.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because Defendants are subject to personal jurisdiction in the Central District of California and

12

1   thus are residents of the District pursuant to 28 U.S.C. § 1391(c), and because a

2   substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in

3   this District.

### BACKGROUND

### Federal Loan Program

6       22.     The Higher Education Act ("HEA") of 1965, 20 U.S.C. § 1101, *et seq.*,

7   sought to make higher education more broadly available by establishing a program of

8   financial aid.  To remove economic restraints to higher education, the HEA, among other

9   things, established a federal education loan program.  The basic structure of the Federal

10  loan program sought to make capital available for the financing of education through

11  private sector lenders, rather than the government.  The program called for private

12  lenders to make educational loans to students at below-market interest rates, without a

13  credit check or collateral.  To encourage private lenders' participation in the program,

14  the government subsidized the interest paid on the loans and protected the lenders

15  against default by guaranteeing repayment through intermediaries called "guarantee

16  agencies."

17      23.     The Federal loan program quickly became the backbone of the higher

18  education system, especially for the highly profitable for-profit sector institutions such as

19  UOP.  In such schools it is common that the majority of their revenues are derived from

20  Federal loan program monies.  Indeed, UOP, in its annual report for 2007, acknowledged

21  that nearly 70% of its revenues were derived from Federal loan programs.

22      24.     As modified and reenacted in 1992, HEA's financial assistance program

23  became known as the Federal Family Education Loan ("FFEL") Program or the Robert

24  T. Stafford Federal Student Loan Program (20 USC § 1071(c)).  The FFEL program

25  consists of three different types of guaranteed student loan programs:  Federal PLUS

26  loans (parents' loans for undergraduate students) (20 U.S.C. § 1078-2); Federal

27  Consolidation Loans (20 U.S.C. § 1078-3); and Stafford Loans (*see* 20 U.S.C. § 1071(c);

28  20 U.S.C. §§ 1077, 1078).

13

25.     General benefits of these loans include deferred interest payments, low monthly interest rates and a six-month post graduation/withdrawal grace period in which to begin loan repayment.

26.     In 2000, 43% of all undergraduate students borrowed money through the Federal loan program and the median debt for undergraduate degree recipients at private universities was $17,250.  Of those students who pursued a professional degree, 87% had borrowed through the Federal loan program, and the median debt of professional degree recipients was $73,533 at private universities and $61,417 at public universities.  In the last decade, Federal loans have increased by 89%.

### Participation in the Federal Loan Program

27.     The majority of for-profit post-secondary institutions such as UOP rely heavily on Federal loan money to operate.  Indeed, in 2007, approximately 69% of UOP's revenues were derived from Federal loan money.

28.     Given the value of the Federal loan program to both students and institutions, and the potential for abuse, the government implemented a series of requirements that institutions must meet in order maintain the right to participate in the loan program.  Foremost among those requirements is the obligation to maintain cohort default rates within certain thresholds.

29.     According to the Cohort Default Rate Guide ("Guide") published by the U.S. Government, a cohort default rate is the percentage of a school's borrowers who enter repayment on Federal loans during that fiscal year and default within the cohort default period.  The formula the Department of Education uses for calculating a school's cohort default rate depends on the number of borrowers from that school entering repayment in particular cohort fiscal year and the number of cohort default rates previously calculated for the school.

30.     According the Guide, cohort default rates are important because defaulted federal student loans cost taxpayers money.  Accordingly, cohort default rate sanctions and benefits provide an incentive to schools to work with their borrowers to reduce

FIRST AMENDED COMPLAINT FOR
INJUNCTIVE, EQUITABLE, AND DECLARATORY RELIEF

default. Sanctions also can prevent a school with a high percentage of defaulters from continuing to participate in the Federal loan program.

31.    The Department of Education has set the following cohort default thresholds:

a.    A school whose most recent official cohort default rate is less than 5.0% and is an eligible home institution that is certifying or originating loans to cover the cost of attendance in a study abroad program may deliver or disburse loan proceeds in a single installment to a student studying abroad regardless of the length of the student's loan period. The school may also choose not to delay the delivery or disbursement of the first installment of loan proceeds for first-year first-time borrowers studying abroad.

b.    A school with a cohort default rate of less than 10.0% for each of the three most recent fiscal years for which data are available, including eligible home institutions and foreign institutions, may deliver or disburse, in a single installment, loans that are made for one semester, one trimester, one quarter, or a four-month period. The school may also choose not to delay the first disbursement of a loan for 30 days for first-time, first-year undergraduate borrowers.

c.    A school whose three most recent official cohort default rates are 25.0% percent or greater, except in the event of a successful adjustment or appeal, will lose loan and grant program eligibility for the remainder of the fiscal year in which the school is notified of its sanction and for the following two fiscal years.

d.    A school whose current official cohort default rate is greater than 40.0%, except in the event of a successful adjustment or appeal, will lose loan program eligibility for the remainder of the fiscal year in which the school is notified of its sanction and for the following two fiscal years.

32.    UOP recognized and repeated these standards in their most recent annual report filed with the Securities and Exchange Commission on Form 10-K. UOP specifically noted that if UOP cohort default rates exceed 10%, it will have a materially

15

1   adverse effect on its business.  UOP's Form 10-K included the following statements

2   pertaining to its dependence upon Federal loans in its operations:

3       a.    "Student Loan Defaults. To remain eligible to participate in

4             Title IV programs, educational institutions must maintain a

5             student loan cohort default rate below 25% for three

6             consecutive years and below 40% for any given year. In

7             addition, if its student loan default rate equals or exceeds 10%,

8             the educational institution must delay for 30 days the release of

9             federal student loan proceeds for first time borrowers and

10            permanently loses the ability to participate in the 'school-as-

11            lender' program as part of the Stafford Loan program, among

12            other penalties....  UOP cohort default rates for the federal

13            student loan programs for 2005 as reported by the U.S.

14            Department of Education were 7.3%....  [W]e have

15            implemented initiatives to mitigate the greater risk of student

16            loan defaults." Form 10-K at p. 22.

17      b.    "If we lose our eligibility to participate in Title IV programs

18            because of high student loan default rates, it would have a

19            material adverse effect on our business.  In addition, if its

20            student loan default rate equals or exceeds 10%, the

21            educational institution is required to delay for 30 days the

22            release of federal student loan proceeds for first time borrowers

23            and permanently loses the ability to participate in the 'school-

24            as-lender' program, among other penalties.  If [UOP's] student

25            loan cohort default rate exceeds 10%, the limitations on our

26            business could have a material adverse impact."

27            Form 10-K at p. 27.

28

FIRST AMENDED COMPLAINT FOR
INJUNCTIVE, EQUITABLE, AND DECLARATORY RELIEF

## GENERAL ALLEGATIONS

33.    By unilaterally cancelling students' Federal loans, UOP improperly denied students the use of federal funds that they had earned and to which they were entitled, under 34 CFR § 668.22, to pay for their educational expenses.

34.    Students seeking to avail themselves of Federal loans are given the following: (1) UOP Financial Aid Application; (2) Free Application for Federal Student Aid ("FASFA"); (3) Federal Stafford Loan Master Promissory Note; (4) UOP's Entrance Interview Form; and (5) UOP's Student Finance Agreement.  None of these documents provide UOP the right to return, cancel, pay off or not distribute the student loans to cover the education costs that have already accrued prior to a student's withdrawal.  To the contrary, the documents provide a detailed breakdown of how funds will be drawn down upon a student's withdrawal.

35.    The UOP school catalog specifically states only that "the University follows the Federal Return of Title IV Funds regulations.  Under the provisions, when a recipient of Federal Student Aid ("FSA") funds withdraws from the University during a payment period, the University must determine the amount of FSA funds earned as of the student's withdrawal date.  If the total amount of funds earned is less than the amount disbursed, funds will be returned to the appropriate FSA Programs.  If the total amount of FSA funds earned is greater than the total amount of funds disbursed, the difference between these amounts may be treated as a post-withdrawal disbursement."

36.    Similarly, the UOP Consumer Information Guide, which provides consumer information to all students and is required for all schools participating in the Federal financial aid program, states the following with respect to the return of Title IV loans:

> If a student withdraws before completing more than 60% of the
> payment period, the percentage of FSA funds earned will equal
> the percentage of the calendar days completed in the payment
> period prior up to the withdrawal date.  After the 60% point in
> the payment period, a student has earned 100% of the FSA

17

1    funds he or she was scheduled to receive during the period.

2    37.    The school's institutional refund policy is consistent:

3    Students who have completed 60% or less of the course of

4    instruction are eligible for a pro rata refund.  The refund will

5    be the amount the student paid for the instruction multiplied by

6    a fraction, the numerator of which is the number of hours

7    (weeks ) of instruction which the student has not received, but

8    for which the student has paid, and the denominator of which is

9    the total number of hours (weeks) instruction for which the

10    student has paid.

11    38.    Ultimately, none of the documents provided by UOP to its students give the

12    school the right to unilaterally return the Federal loan monies to the lenders for accrued

13    tuition charges and then seek that amount directly from the student.  Doing so denies

14    students the use of federal funds to which they were entitled.  UOP's subsequent effort to

15    collect debt which it had extinguished by paying off the loan not only attempts to

16    unilaterally create new debt, it does so on terms far more onerous that those provided by

17    the Federal loan.  For example, once UOP pays off the Federal loan, it demands

18    immediate and full payment from the student.  In stark contrast, under Title IV, a student

19    has a six-month grace period before a loan payment comes due.  Moreover, even after

20    the six-month period, it may take up to 60 days before the lender schedules the first

21    payment, then 270 days of delinquency on the loan by the borrower and after that an

22    average of 90 days for a default claim to be filed.  34 CFR §§ 682.200(b), 682.209(a)(2)

23    and (3).

24    39.    The agreement to repay a Federal loan (the promissory note) is an

25    agreement between the borrower and the lender.  Therefore, the decision to cancel a loan

26    is for the student to make, not UOP.  Unless the school determines that its certification

27    of the student's eligibility is incorrect (which requires a return of Title IV money under

28    34 CFR § 668.22), it does not have standing to cancel the loan.  Only the student or the

18

1  lender can cancel the loan because they are the only parties to the contract. Since the
2  students were eligible for the Title IV loans they received, and neither the Plaintiffs,
3  putative Class members, nor lenders cancelled the loan agreements, UOP's improper
4  return of the students' Federal loan monies – money which was allotted for the payment
5  of the students' tuition debt – represents an unlawful exercise of dominion and control of
6  these funds and cannot result in the students owing a new balance to the school.
7  Whatever Federal loan money UOP took from the students' accounts that was applicable
8  to their accrued tuition is money that should be used to cancel any so-called debt that
9  UOP claims is owed by the students. Any attempt to obtain further payment directly
10  from the students is warrantless, inequitable and unlawful.

11       40.    Moreover, prior to or at the time of enrollment, UOP provided Plaintiffs and
12  members of the Class with financial disclosure documents – including documents
13  entitled "Student Financial Agreement" and "Financial Aid Entrance Interview." The
14  Student Financial Agreement presented Plaintiffs and members of the Class with six
15  options for how they intended to finance their UOP education and required them to
16  select one option as their primary choice. Plaintiffs and members of the Class selected
17  the option designated "Financial Aid Plan". The Student Financial Agreement did not
18  provide Plaintiffs and members of the Class with any meaningful notice that if they were
19  to withdraw from UOP, UOP would not apply Federal financial aid funds to cover their
20  tuition costs. The document entitled "Financial Aid Entrance Interview Form" listed 21
21  topics related to financial aid. Plaintiffs and members of the Class were each required to
22  sign this document, certifying their understanding of the information. The Financial Aid
23  Entrance Interview form did not provide Plaintiffs and members of the Class with notice
24  that if they were to withdraw from UOP, UOP would not utilize Federal financial aid
25  funds to cover their tuition costs, thereby making the students directly liable to the
26  school. To the contrary, the language in the Financial Aid Entrance Interview document
27  suggested just the opposite "**I must repay my entire loan even if I don not complete**
28  **my education...**" The ability to use Title IV financial aid funds to cover the cost of

19

1 | tuition was material for Plaintiffs and members of the Class in choosing to attend UOP.
2 | UOP intended that prospective students rely on these financial documents – requiring
3 | that each student sign and date the Financial Aid Plan and Financial Aid Entrance
4 | Interview forms.  Plaintiffs and members of the Class justifiably relied on these
5 | documents.  UOP knew, or should have known, that these documents omitted material
6 | information and contained misleading representations.  UOP's intent to mislead enrolling
7 | students regarding the utility of Title IV Federal financial aid funds is evident in the
8 | significant pecuniary benefits the school derived from so doing.  But for the availability
9 | of Title IV funds, students who selected the Financial Aid Plan for financing their tuition
10 | – the vast majority of enrolling students – would not have attended UOP.

## CLASS ACTION ALLEGATIONS

41.     Plaintiffs bring this class action pursuant to Rule 23 of the Federal Rules of
Civil Procedure on behalf of themselves and all others similarly situated, with the Class
being defined as follows:

> All students who: enrolled in UOP at any time from
> February 5, 2005 to the present; opted to pay for tuition by
> means of Federal financial aid; applied for and were certified
> to receive Federal financial aid; accrued tuition-related debt;
> whose Federal financial aid was not used to pay for tuition-
> related debt and was instead returned to the lender by UOP;
> and from whom UOP then sought direct payment of such debt.

42.     Plaintiff Russ also seeks to certify a sub-class of California students, with
the California sub-class being defined as follows:

> All students who: enrolled in a UOP campus located in
> California and California residents who enrolled in UOP
> on-line at any time from February 5, 2005 to the present; opted
> to pay for tuition by means of Federal financial aid; applied for
> and were certified to receive Federal financial aid; accrued

20

tuition-related debt; whose Federal financial aid was not used
to pay for tuition-related debt and was instead returned to the
lender by UOP; and from whom UOP then sought direct
payment of such debt.

43.     The members of the Class are so numerous that joinder of all members
would be impracticable.  The precise number of Class members and their addresses are
unknown to Plaintiffs, but each Class Member should be readily identifiable from
information and records in Defendants' possession or control.  Plaintiffs reasonably
estimate that there are thousands of borrowers at issue.

44.     There are questions of law and fact common to the members of the Class
that predominate over any questions affecting only individual members, including, but
not limited to:

        a.      Whether Defendants wrongfully interfered with the rights of
Plaintiffs and Class members by cancelling, returning and/or paying back their Federal
loans and then seeking remuneration directly from the students;

        b.      Whether Defendants breached their contracts with Plaintiffs and
Class members;

        c.      Whether Defendants omitted material information to Plaintiffs and
Class members;

        d.      Whether Defendants representations were likely to mislead Plaintiffs
and Class members;

        e.      Whether Defendants incurred a duty to make full and complete
disclosures after making partial representations that were likely to mislead Plaintiffs and
Class members;

        f.      Whether Defendants' conduct was unfair; and

        g.      Whether, as a result of Defendants' conduct, Plaintiffs and the Class
are entitled to injunctive, restitutionary and/or any other form of equitable relief, and
other relief, and the amount and nature of such relief.

21

45.     The claims of Plaintiffs are typical of the claims of the members of the Class. Plaintiffs have no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiffs.

46.     Plaintiffs will fairly and adequately protect the interests of the Class, and have retained attorneys experienced in class and complex litigation.

47.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy for the following reasons:

        a.     It is economically impractical for members of the Class to prosecute individual actions;

        b.     The Class is readily definable; and

        c.     Prosecution as a class action will eliminate the possibility of repetitious litigation.

48.     A class action will cause an orderly and expeditious administration of the claims of the Class. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured. Absent a class action, Class members will continue to suffer losses, Defendants' violations of law will be allowed to proceed without remedy and Defendants will retain sums received as a result of its wrongdoing.

49.     The prosecution of separate claims by individual Class members would create a risk of inconsistent or varying adjudications with respect to thousands of individual Class members, which would, as a practical matter, dispose of the interests of the Class who were not parties to those separate actions or would substantially impair or impede their ability to protect their interests and enforce their rights.

50.     Plaintiff does not anticipate any difficulty in the management of this litigation as a class action.

/ / /

/ / /

/ / /

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# FIRST CAUSE OF ACTION

## (Fraudulent Misrepresentation)

51.    Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein.  These claims are brought on behalf of the Plaintiffs and the Class against the Defendants.

52.    Defendants at all relevant times knew that the vast majority of newly-enrolling undergraduate UOP students never complete their course of study at UOP.

53.    Defendants at all relevant times knew that its policy was to return Title IV financial aid loan funds to lenders for students who withdrew from UOP early in their programs of study.

54.    Prior to or at the time of enrollment, UOP provided Plaintiffs and members of the Class with a document entitled "Student Financial Agreement."  The Student Financial Agreement presented Plaintiffs and members of the Class with six options with respect to financing their education.  Plaintiffs and members of the Class selected the option designated "Financial Aid Plan."  The Student Financial Agreement failed to provide Plaintiffs and members of the Class with notice that if they were to withdraw from UOP, UOP would not apply Federal financial aid funds to their outstanding tuition costs.

55.    Prior to or at the time of enrollment, UOP provided Plaintiffs and members of the Class with a document entitled "Financial Aid Entrance Interview."  The Financial Aid Entrance Interview document addressed 21 topics related to financial aid.   The Financial Aid Entrance Interview document failed to provide Plaintiffs and members of the Class with notice that if they were to withdraw from UOP, UOP would not utilize Federal financial aid funds to cover their tuition costs.

56.    Moreover, the Financial Aid Entrance Interview document contained information likely to mislead students because it suggested just the opposite – that UOP students who withdrew from the program would have the use of their Federal financial

1 | aid funds to cover their tuition costs ("**I must repay my entire loan even if I do not**
2 | **complete my education...**").

3 |     57.    The ability to obtain Title IV loans to cover the cost of tuition was material
4 | to Plaintiffs and members of the Class in choosing to attend UOP.

5 |     58.    Defendants knew, or had reason to know, that the ability of students to
6 | obtain and utilize Title IV loans was material to their decision to enroll at UOP.

7 |     59.    Defendants intended that prospective students rely on the Student Finance
8 | Agreements and Financial Entrance Interview forms – requiring that each student sign
9 | and date each document – acknowledging their understanding and agreement with the
10 | contents.

11 |     60.    Plaintiffs and members of the Class justifiably relied on the information
12 | contained on the Student Finance Agreements and Financial Entrance Interview forms.

13 |     61.    Defendants knew, or should have known, that the Student Finance
14 | Agreement and Financial Aid Entrance Interview forms contained misleading
15 | representations and/or omitted material information.

16 |     62.    But for the availability of Federal financial aid funds, Plaintiffs and
17 | members of the Class would not have enrolled in the school.

18 |     63.    As a direct and proximate result of Defendants' aforementioned fraud,
19 | deceit, omissions and misleading representations, Plaintiffs and Class members suffered
20 | damages in an amount equal to the amount they paid UOP.

21 |     64.    Defendants acted with intent to defraud, or with reckless disregard of the
22 | rights of Plaintiffs and the members of the Class.

23 |     65.    Plaintiffs and members of the Class request that the Court grant Injunctive
24 | Relief directing UOP to provide clear and meaningful notice to prospective students
25 | warning them that should the student withdraw from the school early in their course of
26 | study, UOP will not apply Title IV Federal financial aid loan funds to cover their tuition
27 | costs and, instead, will bill the students directly for their entire balance; and if their

28 |

balance is not paid in-full within 6 months, it may be reported to collections and credit agencies.

## SECOND CAUSE OF ACTION

### (Conversion)

66.   Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein.  These claims are brought on behalf of Plaintiff Russ and the California sub-class against the Defendants.

67.   Plaintiff Russ and each member of the California sub-class had a legal right to the use and possession of their Title IV funds at the time of the conversion.

68.   UOP intentionally asserted control over Plaintiff Russ' and each California sub-class member's Title IV funds – interfering with Plaintiff Russ' and each California sub-Class members' legal right to the funds and using the funds in a manner for which UOP was not authorized.

69.   UOP asserted control over Plaintiff Russ' and each California sub-class member's Title IV funds in order to manage UOP's cohort default rates, demonstrating that UOP's action was in bad faith.

70.   By intentionally returning the Title IV funds to which Plaintiff Russ and the California sub-Class members were legally entitled, UOP seriously, completely, and permanently interfered with Plaintiffs' and the class  members' rights to their Title IV funds.

71.   After having wrongly taken the Title IV funds from Plaintiff Russ and the California sub-Class members for its own purposes, UOP billed Plaintiff Russ and the California sub-Class members for the amount of the Title IV funds that UOP had taken from them – demanding immediate payment.

72.   Plaintiff Russ requests that UOP reimburse Plaintiff Russ and the California sub-Class members in full for any Federal financial aid funds that were wrongly taken from them, and for the amount of any further pecuniary loss of which the deprivation has been a legal cause.

FIRST AMENDED COMPLAINT FOR
INJUNCTIVE, EQUITABLE, AND DECLARATORY RELIEF

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## THIRD CAUSE OF ACTION

### (Breach of Contract)

73.    Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein.  These claims are brought on behalf of Plaintiffs and the members of the Class against the Defendants.

74.    Plaintiffs and each member of the Class signed Enrollment Agreements and Student Financial Agreements which were valid and enforceable contracts between UOP and Plaintiffs and UOP and Class members.

75.    The enrollment agreements obligated the Plaintiffs and the Class members to pay UOP tuition.

76.    A material term, incorporated into the enrollment agreements, was that Plaintiffs' and Class members' tuition would be paid by Title IV loans.  Plaintiffs' and the Class members' contract performance was thus contingent upon being deemed eligible for Title IV loan money to be used to pay their tuition to UOP.  Plaintiffs' and members of the Class each received letters from UOP indicating they were deemed eligible to receive Title IV Financial Aid assistance.

77.    Plaintiffs and each member of the Class completed applications for Title IV financial aid loans; and each Plaintiff and member of the Class were subsequently told the 9dates when their financial aid loan funds would be available for disbursement. Plaintiff and the Class members authorized the funds to be used for the payment of their tuition to UOP.  In so doing, Plaintiffs and each class member met their contractual obligations to UOP.

78.    By selecting the Financial Aid Plan option on the Student Financial Agreement, it was understood that UOP would credit the Title IV loan money toward the payment of Plaintiffs' and the Class members' tuition.

79.    Upon withdrawing from classes, UOP unilaterally, without the knowledge or consent of Plaintiffs and the Class members, improperly cancelled, returned, paid off

26

1  and/or did not disburse their Federal loans, breaching UOP's contracts with Plaintiffs
2  and each member of the Class.

3    80.    After returning Federal loan money to the lenders, UOP sought payment of
4  outstanding tuition costs directly from the students.

5    81.    Nothing in the contract between the students and UOP allows UOP to
6  unilaterally pay off student loans under these conditions, nor to create a new debt.

7    82.    Plaintiffs and the Class members performed their contractual obligations
8  and should not have been required to pay UOP for debt which should have been paid
9  from the Federal loan money.

10    83.    Plaintiffs and the Class request that the Court grant Injunctive Relief
11  directing UOP to stop this practice or to include language in the Student Financial
12  Agreements which clearly and meaningfully gives notice to prospective students
13  warning them that should the student withdraw from the school early in their course of
14  study, UOP will not apply Title IV Federal financial aid loan funds to cover their tuition
15  costs and, instead, will bill the students directly for their entire balance; and if their
16  balance is not paid in full within six months, it may be reported to collections and credit
17  agencies.

## FOURTH CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

20    84.    Plaintiffs incorporate by reference and reallege all paragraphs previously
21  alleged herein.  These claims are brought on behalf of Plaintiff Russ and the California
22  sub-class against the Defendants.

23    85.    The contracts entered into between Plaintiff Russ and the members of the
24  California sub-class and Defendants, embodied in the Enrollment Agreements and
25  Student Financial Agreements contain an implied covenant of good faith and fair dealing
26  prohibiting Defendants from doing anything that would unfairly interfere with Plaintiff's
27  rights to receive the benefits of the agreements, and from engaging in arbitrary or unfair
28  acts that would unfairly take advantage of Plaintiff.

27

86.    UOP's actions unfairly interfered with Plaintiff Russ' and California sub-Class members' rights under their contracts with UOP – specifically by precluding the formers' rights to pay for their education through Federal loans.

87.    Plaintiff Russ and the California sub-Class members performed all, or substantially all, of the significant things that the contracts with UOP required them to perform.

88.    By engaging in the conduct complained of herein, Defendants unfairly and in bad faith enriched themselves, at the expense of Plaintiff Russ and the California sub-lass members, and impeded the rights of Plaintiff Russ and members of the California sub-class to receive the benefits of the agreements

## FIFTH CAUSE OF ACTION

### (Unjust Enrichment)

89.    Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein.  These claims are brought on behalf of  Plaintiff Russ and the California sub-class against the Defendants.

90.    Plaintiff Russ and the California sub-class reasonably understood from the contracts drafted by Defendants that their tuition debt was to be paid through Federal financial aid funds.  Plaintiff Russ and the California sub-class applied for these funds and were later informed by Defendants that their loan funds had been approved.

91.    Defendants, without the knowledge or consent of Plaintiff Russ and the California sub-class, unilaterally returned the Federal loan funds – for their own purposes.

92.    The fact that Defendants chose to return the Federal loan funds that Defendants had received from lenders which were intended to be used to pay for any accrued tuition costs incurred by Plaintiff Russ and the California sub-class should not negate the fact that Plaintiff Russ and the California sub-class had met their obligation for payment of the accrued tuition costs.

93.   Defendants' receipt of the aforementioned Federal loan funds should have extinguished the tuition debt for Plaintiff Russ and the California sub-class.

94.   By returning the Federal loans issued to Plaintiff Russ and the California sub-class and then subsequently charging for the debt Defendants extinguished, Defendants were unjustly enriched.

95.   It would be unjust for Defendants to retain these benefits.  Defendants have knowledge of these benefits.

96.   Plaintiff Russ and the California sub-class request that the Court, in the interests of justice, disgorge any monetary benefits received by Defendants as a result of billing Plaintiff Russ and the California sub-class for tuition debt created by Defendants' return of Plaintiff's and members of the California sub-class' Title IV federal loan funds.

### SIXTH CAUSE OF ACTION

### (Consumers Legal Remedies Act – Cal. Civ. Code § 1750, *et seq.*)

97.   Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein.  These claims are brought on behalf of the Plaintiff Russ and the California sub-class against the Defendants.

98.   This cause of action is brought pursuant to the California Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* ("CLRA").  This cause of action does not seek monetary damages and is limited solely to injunctive relief.

99.   Defendants' actions, representations and conduct have violated, and continue to violate, the CLRA because they extend to transactions that are intended to result, or which have resulted in, the sale of services to consumers.

100.  Plaintiff Russ and the California sub-Class members are "consumers" as that term is defined by the CLRA in Cal. Civ. Code § 1761(d).

101.  The courses of study that Plaintiff and members of the sub-class purchased from Defendants were "services" within the meaning of Cal. Civ. Code § 1761(b).

102.  By engaging in the aforementioned actions, misconduct and misrepresentations – including both omissions and misleading representations –

29

Defendants have violated, and continue to violate, Cal. Civ. Code § 1770(a)(5) ("Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have"). Defendants represent that Federal financial aid funds can be used to cover the cost of its educational services and omit to provide meaningful notice that Federal financial aid funds will be returned, cancelled, and/or not disbursed for students who withdraw.

103. By engaging in the aforementioned actions, misconduct and misrepresentations – including both omissions and misleading representations – Defendants have violated, and continue to violate, Cal. Civ. Code § 1770(a)(9) ("Advertising goods or services with intent not to sell them as advertised"). Defendants advertise that Federal financial aid will cover tuition costs but omit to provide meaningful notice that Federal financial aid funds will be returned, cancelled, and/or not disbursed for students who withdraw.

104. By engaging in the aforementioned actions, misconduct and misrepresentations – including omissions and misleading representations – Defendants have violated, and continue to violate, Cal. Civ. Code § 1770(a)(14) ("Representing that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law"). Defendants represent to prospective students applying for Federal financial aid that the prospective students will have the right to finance their education with Federal financial aid funds and will be obligated to re-pay the Federal financial aid monies even if the student withdraws from UOP but omit to inform the prospective students that this will not be so if the students withdraw from the program.

105. By engaging in the aforementioned actions, Defendants have violated, and continue to violate, Cal. Civ. Code § 1770(a)(19) ("Inserting an unconscionable provision in the contract").

FIRST AMENDED COMPLAINT FOR
INJUNCTIVE, EQUITABLE, AND DECLARATORY RELIEF

106. Plaintiff Russ requests that this Court enjoin Defendants from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to Cal. Civ. Code § 1780(a).

## SEVENTH CAUSE OF ACTION

### (Violations of the California Unfair Competition Law,

### Bus. & Prof. Code § 17200, *et seq.* )

107. Plaintiffs hereby incorporate by reference each of the preceding paragraphs as though fully set forth herein.

108. This claim is asserted by Plaintiff Russ on her own behalf and on behalf of the California sub-Class members.

109. Plaintiff Russ has standing to bring this claim since, prior to or at the time of enrollment, UOP provided her with financial disclosure documents which both omitted material information and contained misleading representations about the ability to utilize Federal financial aid funds to cover the tuition costs she would incur if she elected to attend UOP. The information misrepresented in these documents was material in Plaintiff Russ' decision to enroll in UOP. UOP intended that Ms. Russ rely on these documents, specifically requiring that Ms. Russ sign and date each document. Ms. Russ did as she was instructed by UOP – signing and dating each document – thereby demonstrating that she relied on their content. As a direct and proximate result of UOP's misrepresentations, Ms. Russ was deceived and paid money to UOP. But for the misrepresentations, Ms. Russ would not have enrolled in UOP. Ms. Russ was injured in the amount she paid to UOP.

110. The Unfair Competition Law ("UCL") defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice. Cal. Bus. & Prof. Code § 17200.

111. A business practice is "unlawful" under the Unfair Competition Law if it is forbidden by law, including state or federal regulations.

31

112.   As a violation of any law may serve as the predicate for a violation of the "unlawful" prong of the Unfair Competition Law, Plaintiff Russ alleges that UOP, in violating the CLRA and the common laws alleged herein, also violated the UCL.

113.   A business act or practice is "unfair" under the Unfair Competition Law if the reasons, justifications and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

114.   A violation of the "unfair" prong of the UCL requires a balancing analysis between the conduct of the Defendants and the harm to the Plaintiffs and the Class.

115.   UOP violated, and continues to violate, the "unfair" prong of the UCL in the following ways:

      a.   UOP, knowing that the majority of students it enrolled would withdraw prior to completing the program, concealed from Plaintiff Russ and the California sub-class that early withdrawal from their programs would result in the return of their Federal financial aid to their lenders and result in the inability of students to use such funds to pay for tuition-related debt;

      b.   After having received Plaintiff Russ and the California sub-class' Federal financial aid loan funds, UOP unilaterally returned the students' loan funds, and then billed the students directly and with terms far more onerous for the students than the terms associated with Federal financial aid – demanding that students pay their balances in full to UOP or risk being reported to collections and credit agencies;

      c.   By returning Federal financial aid funds, UOP removes a student from the cohort default matrix, thereby enabling UOP to manage its cohort default rates by removing students who are statistically at a high risk of defaulting.

      d.   UOP also continues to benefit from its unfair conduct by enrolling thousands of students and obtaining money as a result.

116.   The gravity of the harm to Plaintiff Russ and members of the California sub-class resulting from such unfair acts and practices outweighs any conceivable

FIRST AMENDED COMPLAINT FOR
INJUNCTIVE, EQUITABLE, AND DECLARATORY RELIEF

reason, justification and/or legitimate motive for UOP to engage in such unfair acts and practices.

117. A business act or practice is "fraudulent" under the Unfair Competition Law if it actually deceives, or is likely to deceive, members of the consuming public.

118. Defendants' acts and practices as described herein have deceived and/or are likely to deceive members of the consuming public, including Plaintiff Russ and the California sub-class.

119. UOP's practice of canceling, returning, and/or refusing to permit students to utilize the Federal financial aid funds without clearly disclosing its policy to prospective students, who have informed UOP they would be relying on Federal financial aid to finance their tuition, is deceptive.

120. By committing the acts and practices alleged above, UOP has engaged, and continues to be engaged, in unlawful and unfair and fraudulent business practices within the meaning of California Business and Professions Code § 17200, *et seq.*

121. Through its unlawful, unfair and fraudulent acts and practices described herein, UOP has obtained, and continues to unlawfully, unfairly, and fraudulently obtain, money from Plaintiff Russ and members of the California sub-class. As such, Plaintiff Russ requests that this Court cause Defendants to restore this money to Plaintiff Russ and all California sub-Class members, and to enjoin Defendants from continuing to violate the Unfair Competition Law as discussed herein. Otherwise, Plaintiff and the California sub-class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs, on behalf of themselves and all others similarly situated, pray for judgment against Defendants as follows:

1. Declaratory relief: A judgment declaring that any debt owed to UOP by former UOP students, that was incurred as a result of UOP's practices as described herein, be deemed unenforceable;

33

2.    A permanent injunction:

    a.    enjoining Defendants from continuing this practice;

    b.    requiring UOP to rescind all collection agency referrals for affected students;

    c.    directing collection agencies to retract any negative reports made to credit agencies concerning affected students;

    d.    directing UOP to cease billing Plaintiffs and all Class members for all monies which UOP improperly returned to the third party lenders;

    e.    directing UOP to provide clear and meaningful notice to prospective students warning them that should the student withdraw from the school early in their course of study, UOP will not apply Title IV Federal financial aid loan funds to cover their tuition costs and, instead, will bill the students directly for their entire balance; and if their balance is not paid in full within six months, it may be reported to collections and credit agencies.

3.    Restitution, including reimbursement to Plaintiff Russ and all California sub-Class members, of all monies paid to UOP by or on behalf of the students after their Title IV loans had been returned to the third party lenders and their debt extinguished;

4.    An award of any additional equitable relief and/or any damages incidental to the requested injunctive relief;

5.    An award of reasonable attorneys' fees and costs;

6.    Statutory pre-judgment and post-judgment interest; and

7.    All other relief that this Court may deem just and proper.

/ / /

/ / /

/ / /

1

## **DEMAND FOR JURY TRIAL**

Plaintiffs and the class demand a jury trial in this action for all the claims so triable.

DATED:  August 11, 2009

Respectfully Submitted,

**BRAUN LAW GROUP, P.C.**

By: _____
Michael D. Braun
10680 W. Pico Boulevard, Suite 280
Los Angeles, CA 90064
Phone:  (310) 836-6000
Fax:     (310) 836-6010

Janet Linder Spielberg
**LAW OFFICE OF JANET LINDNER SPIELBERG**
12400 Wilshire Blvd., Suite 400
Los Angeles, CA 90025
Phone:  (310) 392-8801
Fax:     (310) 278-5938

Richard A. Adams
**PATTON ROBERTS, PLLC**
2900 St. Michael Drive, Suite 400
Texarkana, TX 75505-6128
Telephone:  (903) 334-7000
Facsimile:   (903) 334-7007

**ATTORNEYS FOR PLAINTIFFS**

35

# PROOF OF SERVICE

STATE OF CALIFORNIA )

)ss.

COUNTY OF LOS ANGELES )

I am employed in the county of Los Angeles, State of California, I am over the age of 18 and not a party to the within action; my business address is 10680 W. Pico Boulevard, Suite 280, Los Angeles, CA 90064

On August 11, 2009, I served on the interested parties in said action the within documents:

**FIRST AMENDED COMPLAINT FOR INJUNCTIVE, EQUITABLE, AND DECLARATORY RELIEF**

X     **BY FACSIMILE TO THE ATTACHED SERVICE LIST.**

I caused a facsimile machine transmission from facsimile machine telephone number (310) 836-6010 to the facsimile machine telephone number(s) in the **SERVICE LIST** attached below. Upon completion of said facsimile machine transmission(s), the transmitting machine issued a transmission report(s) showing the transmission(s) was/were complete and without error.

X     **BY ELECTRONIC MAIL TO THE ATTACHED SERVICE LIST.**

I declare I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on August 11, 2009 in Los Angeles, California.

_____
Carolyn Corazo

1

Case No. CV 09-0904 VBF (FMOx)                                           PROOF OF SERVICE

**SERVICE LIST**

Felicia Y. Yu
Margaret Grignon
Behzad B. Mohandesi
Jordan S. Yu
Felicia Yu
REED SMITH LLP
355 South Grand Avenue, Suite 2900
Los Angeles, CA 90071-1514
Phone:   (213) 457-8000
Fax:       (213) 457-8080
Email:    fyu@reedsmith.com
              mgrignon@reedsmith.com
              bmohandesi@reedsmith.com
              jsyu@reedsmith.com
              fyu@reedsmith.com; cspoon@reedsmith.com
**ATTORNEYS FOR**
**Defendants APOLLO GROUP, INC., and**
**THE UNIVERSITY OF PHOENIX, INC.**

Janet Lindner Spielberg
**LAW OFFICE OF JANET LINDNER SPIELBERG**
12400 Wilshire Blvd., Suite 400
Los Angeles, CA 90025
Phone:   (310) 392-8801
Fax:       (310) 278-5938
Email:    jlspielberg@jlslp.com
**COUNSEL FOR PLAINTIFFS**

Richard A. Adams
Corey D. McGaha
Leisa Beaty Pearlman
Phillip N. Cockrell
**PATTON ROBERTS PLLC**
2900 St.  Michael Drive, Suite 400
Texarkana, Texas 75505-6128
Phone:   (903) 334-7000
Fax:       (903) 334-7007
Email:    radams@pattonroberts.com
              cmcgaha@pattonroberts.com; mcosta@pattonroberts.com;
                shicks@pattonroberts.com
              lpearlman@pattonroberts.com; pdesantis@pattonroberts.com
                pcockrell@pattonroberts.com; kharris@pattonroberts.com
**COUNSEL FOR PLAINTIFFS**

2